FILED

2009 Jun-25 AM 09:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| GAIL E. THOMAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 2:07-CV-02117-KOB |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

### I. Introduction

The claimant, Gail E. Thomas, brings this action seeking judicial review of a final

decision of the Commissioner of Social Security that partially denied her claim for Social

Security Disability Insurance ("SSDI") and Supplemental Security Income ("SSI").

On August 10, 2003, the claimant protectively filed an application for SSDI benefits and

SSI under Titles II and XVI, respectively, of the Social Security Act. The claimant alleged that

she had been disabled since January 5, 2003, because of adenocarcinoma of the left breast

requiring surgery, chemotherapy, and radiation. The Social Security Administration ("SSA")

initially denied the claimant's application on January 9, 2004, and the claimant requested a

hearing before the Administrative Law Judge ("ALJ") on January 23, 2004. At the hearing before

the ALJ on September 14, 2005, the claimant alleged disability due to adenocarcinoma of the left

breast, low back pain resulting from a car accident on March 25, 2004, right shoulder pain, and

depression. Although the claimant argues to the contrary, the ALJ stated in his opinion that at the

hearing, the claimant amended the alleged onset date of disability to include (1) a closed period

from January 2, 2003 (the date she first complained of pain in her left breast) through January 7,

2004 (the date chemotherapy and radiation therapy were completed) and (2) continuously from

on or about May 10, 2004 (the date depression was first diagnosed). The ALJ issued a partially

favorable decision on June 16, 2006, awarding a closed period of benefits from January 2, 2003,

through January 7, 2004, but denying benefits from or about May 10, 2004. The claimant

appealed to the SSA Appeals Council from the denial of benefits, which denied the claimant's

request for review on September 18, 2007. This denial rendered the ALJ's opinion the

Commissioner's final decision. Thus, this case is now ripe for review pursuant to § 205(g) of the

Social Security Act, 42 U.S.C. § 405(g). For the reasons stated below, the decision of the

Commissioner is AFFIRMED.

## II. Issue Presented

The claimant presents the following issues for review: (1) whether the ALJ improperly

determined that the claimant amended her alleged period of disability; and (2) whether the ALJ

improperly disregarded the opinions of the treating physicians.

## III. Standard of Review

The standard for reviewing the Commissioner's decision is limited. This court must

affirm the Commissioner's decision if the Commissioner applied the correct legal standards and

if his factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham

v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir.

1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions,

including determination of the proper standards to be applied in evaluating claims." *Walker*, 826

F.2d at 999. The court does not review the Commissioner's factual determinations *de novo*, but the court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but the court must also view the record in its entirety and take account of evidence that detracts from the evidence upon which the ALJ relied. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

### IV. Legal Standard

A person is entitled to disability benefits when he or she cannot engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period if not less than 12 months. 42 U.S.C. § 423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential evaluation process:

(1) Is the person presently employed?
(2) Is the person's impairment severe?
(3) Does the person's impairment meet or equal on of the specific impairments as set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
(4) Is the person unable to perform his or her former occupation?
(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen,* 800 F.2d 1026, 1030 (11th Cir. 1986); *see also* 20 C.F.R. §§ 404.1520,

416.920.

The ALJ may reject any medical opinion if the evidence supports a contrary finding.

*Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985). Additionally, the ALJ must accord

"substantial weight" or "considerable weight" to the opinion, diagnosis, and medical evidence of

the claimant's treating physician unless good cause exists for not doing so. *Jones v. Bowen*, 810

F.2d 1001, 1005 (11th Cir. 1986); *Broughton v. Heckler*, 776 F.2d 960, 961 (11th Cir. 1985). The

Eleventh Circuit has found "good cause" existed where the treating physician's opinion was not

bolstered by the evidence or where the evidence supported a contrary finding. *See Schnorr v.*

*Bowen*, 816 F.2d 578, 582 (11th Cir. 1987); *Sharfarz v. Bowen*, 825 F.2d 278, 280-81 (11th Cir.

1987). The Eleventh Circuit has also found "good cause" where the treating physician's opinions

were wholly conclusory or inconsistent with the treating physician's own medical records. *See*

*Jones v. Dep't of Health & Human Servs.*, 941 F.2d 1529, 1532-33 (11th Cir. 1991); *Edwards v.*

*Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); *Crawford v. Comm'r*, 363 F.3d 1155, 1160 (11th

Cir. 2004)."The ALJ must clearly articulate the reasons for giving less weight to the opinion of a

treating physician, and the failure to do so is reversible error." *Lewis v. Callahan*, 125 F.3d 1436,

1440 (11th Cir. 1997).

## V. Facts

The claimant is a high school graduate who was forty years old on September 14, 2005,

the date of the hearing before the ALJ. (R. 250). Her past work experience includes employment

as a fast food worker, cashier, teller, and machine operator in a plastics plant. (R. 25). The

claimant alleges that she became unable to work on January 2, 2003, because of adenocarcinoma

of the left breast, low back pain, right shoulder pain, and depression. (R. 18). The claimant alleges that she is unable to lift anything heavier than ten to fifteen pounds or sit for longer than ten minutes at a time. (R. 23). The claimant further claims that because of her mental state, she prefers isolation and is "afraid half the time," suffering anxiety attacks two to three times per week. (R. 23). Additionally, the claimant has a history of cocaine abuse. (R. 27).

*January 2, 2003 - January 7, 2004*

"[T]he medical evidence of record shows an individual presenting with an unremarkable medical history prior to January 2003 with the exception of the removal of a benign cyst from her left breast and a history of abuse of cocaine, with treatment through an in-house patient treatment program between November 2000 and November 2001." (R. 19). On January 2, 2003, the claimant went to Baptist Medical Center - Montclair complaining of a painful mass in her left breast. (R. 192). The emergency room physician, Dr. Steven Real, referred her to outpatient services for a mammogram. (R. 192). The report from a follow-up examination on January 13, 2003, noted that the mammogram showed a suspicious lesion of the region of the palpable mass. (R. 118). On January 20, 2003, the claimant underwent a needle biopsy, which was positive for infiltrating moderately-to-poorly differentiated adenocarcinoma, ductal type, grade two to three of three, and focal tumor necrosis. (R. 111). The doctors at Baptist Medical Center - Montclair diagnosed the claimant with metastatic breast cancer. (R. 19). On February 13, 2003, the claimant underwent a left partial mastectomy and left sentinel node biopsy for invasive cancer. (R. 101). The doctors subsequently referred the claimant for chemotherapy and radiation. (R. 101). The claimant also had a Port-A-Cath placed in her right shoulder on February 13, 2003, to use in future chemotherapy. (R. 101).

In May 2003, the claimant began chemotherapy treatment, consisting of eight cycles of combined Adriamycin and Cytoxan therapy. (R. 129 - 131). The claimant finished her chemotherapy treatments on September 22, 2003. (R. 123). Physical examinations performed during the claimant's chemotherapy treatments rated the claimant's performance status as excellent and without complications. (R. 124). Dr. James Lasker, the supervising, attending, and treating physician for the claimant's chemotherapy at Baptist Medical Center - Princeton, described the claimant as asymptomatic except for episodes of low back pain. (R. 123). Dr. Lasker noted that the claimant denied having any headaches, recurrent back pain, shortness of breath, or chest pain. (R. 125).

After completing chemotherapy, the claimant began receiving radiation treatment under the supervision of Dr. John Pinkston, the attending radiation oncologist at Baptist Medical Center - Princeton. (R. 145). At the claimant's initial assessment on October 6, 2003, the claimant complained of mild headaches and fatigue, but otherwise her general health was relatively good. (R. 146). The claimant received her first radiation therapy session on October 27, 2003. (R. 143). She received three more cycles and completed radiation therapy on January 7, 2004. (R. 143). Dr. Pinkston reported that she tolerated the course of radiation therapy satisfactorily and indicated that the radiation side effects were mild and well-controlled. (R. 143).

*After January 8, 2004*

In March 2004, a whole-body bone scan and CT of the claimant's chest showed a suspicious abnormality with increasing density in the left breast but no abnormal bony uptake to suggest recurrent metastatic disease. (R. 172 - 77). Additionally, on March 25, 2004, the claimant went to the Baptist Medical Center - Princeton emergency room complaining of low back and

left knee pain following a motor vehicle accident the previous evening. (R. 180 - 90). The emergency room physician noted that the claimant had no focal deficit and did not show any signs of acute distress. (R. 19). The physician also noted that the claimant had fully intact sensory and neuro-motor function, including gait. (R. 19). Radiological studies of the claimant's left knee revealed no acute process or fracture. (R. 19). The emergency room physicians assessed the claimant with a lumbar strain and left knee contusion. (R.20). The doctors released the claimant after prescribing a left knee brace and medications. (R. 20). The record does not reveal any subsequent treatment for these injuries. (R. 20).

Following a referral from the Princeton Baptist Medical Center Oncology Department, on May 10, 2004, the claimant went to see Dr. Wolfram Glaser, a licensed psychiatrist associated with Western Mental Health Center. (R. 226). Dr. Glaser performed an initial psychiatric assessment noting that the claimant reported the onset of depression two years earlier after one year of sobriety from cocaine use. (R. 226). Although the claimant displayed a dysphoric mood and somewhat restricted range of affect, Dr. Glaser found the claimant's memory, attentiveness, judgment, general fund of information, and intelligence categorically "ok" and within functional limits. (R. 226). Dr. Glaser diagnosed the claimant with Major Depressive Disorder, obesity, a history of breast cancer, and cocaine dependence with physiological dependence in sustained full remission. (R. 229). Dr. Glaser further diagnosed the claimant with a current Global Assessment of Functioning ("GAF") rating of forty-two with the highest GAF rating in the past year being forty-five. (R. 230). Dr. Glaser prescribed Lexapro to the claimant. (R. 225).

On May 25, 2004, the claimant telephoned Dr. Glaser and complained of anxiety and insomnia. (R. 20). In response to this complaint, Dr. Glaser prescribed Trazadone to the clamaint.

(R. 222). On June 14, 2004, the second and last time Dr. Glaser saw the claimant, he reported that she was "better," and Trazodone had helped normalize restorative sleep. (R. 221).

On October 12, 2004, the claimant visited Dr. T. E. Stone, a psychiatrist with Eastside Mental Health Center. (R. 213). The claimant reported cyclic episodes of depression followed by periods of time when she did well. (R. 213). The claimant also reported having affective symptoms including crying spells, withdrawal, lack of motivation, loss of interest, sleep problems, and poor appetite. (R. 213). The claimant further described a history of drug use over a period of five to six years, but stated that she had been in complete remission for three years. (R. 215). Dr. Stone described the claimant as nicely dressed and groomed. (R. 216). Dr. Stone also stated that the claimant was in no apparent distress, presenting with adequate thought process, good memory, average intelligence, normal motor function, a full range of affect, and congruent mood. (R. 216). Dr. Stone diagnosed the claimant with Major Depressive Disorder, recurrent and moderate, and cocaine dependence with physiological dependence in sustained full remission. (R. 217). Dr. Stone estimated that her GAF rating was fifty with the highest during the past year also estimated at fifty. (R. 217). Dr. Stone continued the claimant on the medications prescribed by Dr. Glaser, Lexapro and Trazodone. (R. 211 - 17).

On November 29, 2004, the second and final time the claimant saw Dr. Stone, Dr. Stone noted that the claimant had run out of medications two weeks earlier and noticed "a good bit of difference," including an increase in depression. (R. 212). Dr. Stone assessed recurrent Major Depression Disorder and severe polysubstance dependence in sustained remission. (R. 212). Dr. Stone again prescribed Lexapro and Trazodone to the claimant. (R. 212).

At the request of her representative, the claimant saw Dr. Gerald Anderson, a licensed

8

psychologist. (R. 202). During the examination on September 13, 2005, the claimant reported a relapse of crack cocaine use in June 2005 and entry into an inpatient drug treatment program. (R. 204). The claimant also reported the following: being off all psychotropic medications; relapse of cocaine use; onset of depression and anxiety, secondary to treatment for breast cancer; self-isolation from others; onset of irritability and anxiousness when around others; extreme fear when in new surroundings; being easily bored by her past jobs; difficulty focusing; periods of increased energy; the ability to clean her house; moving from task to task in a haphazard manner; impulsive spending habits; a tendency toward drug use during periods of acceleration; and a good appetite. (R. 204 - 205). The claimant also alleged having a number of vegetative signs and symptoms of depression and anxiety. (R. 204 - 205).

Dr. Anderson noted that the claimant presented with below average reasoning skills but otherwise showed adequate recent and remote memory. (R. 205). Further, he noted that the claimant's thought process was normal in form and only mildly circumstantial. (R. 206). Dr. Anderson conducted a Beck Depression Inventory, which placed the claimant in the moderate range of depression. (R. 206). Dr. Anderson noted that, although he was not definitively certain, test results appeared to suggest some inattentive difficulties most likely due to depression and anxiety instead of an attention deficit disorder. (R. 206). He further noted that the claimant likely did not have sufficient judgment to make acceptable work decisions and that her judgment in cooperating with others might be periodically impaired. (R. 207). Dr. Anderson diagnosed the claimant with Bipolar II Affective Disorder, Generalized Anxiety Disorder, Panic Disorder without agoraphobia, and cocaine dependence in remission. (R. 207). Dr. Anderson estimated her current GAF level to be thirty-five. (R. 207).

Finally, on a Supplemental Questionnaire as to Residual Functional Capacity, Dr. Anderson indicated marked restrictions of activities of daily living and marked difficulty in maintaining social function. (R. 208). Dr. Anderson noted marked deficiencies in concentration, persistence, or pace and an extreme impairment of the ability to respond to customary work pressure. (R. 208). He indicated a marked level of impairment in ability to understand, carry out, and remember instructions in a work setting and extreme limitations in the areas of responding appropriately to supervision or co-workers in a work setting. (R. 209). Dr. Anderson also noted only moderate difficulties in performing simple or repetitive tasks in a work setting. (R. 209).

*Hearing Before the ALJ*

At the hearing before the ALJ on September 14, 2005, the claimant testified that she was single with three children. (R. 246). She testified that she was voluntarily staying at Alethia House, a substance abuse treatment facility, after using crack cocaine once. (R. 247 - 49, 253 - 54). The claimant further stated that she was unemployed and received food stamps and child support. (R. 251). The claimant stated that she was unable to work because she could not lift anything heavier than ten or fifteen pound; however, the claimant stated that she could only lift five to ten pounds between February 2003 and January 2004. (R. 252, 256 - 57). The claimant further testified that because of her state of mind, she prefers isolation and is "afraid half the time." (R. 252). She also claimed to have had anxiety attacks twice a week since the middle of 2000. (R. 252).

The claimant testified that she had pain in her left breast, right arm, and lower back. (R. 254 - 55). The claimant testified that because of the pain, she had trouble sleeping. (R. 259). She stated that Dr. Barr prescribed Trazadone, which helped her ability to sleep and had not given her

10

any other side effects. (R. 259 - 60). The claimant testified that she had experienced daily pain since February of 2003. (R. 261). She further testified that her normal pain rating was at a level of eight out of ten. (R. 261). The claimant stated that she used over-the-counter medication and heating pads to try to control the pain, but that these remedies only relieved the pain for about two hours. (R. 262). Additionally, the claimant testified that she underwent eight chemotherapy treatments and thirty-six radiation treatments. (R. 263 - 65).  She stated that she experienced side effects from chemotherapy and radiation including alopecia and fatigue. (R. 260, 263). The claimant testified that the port in her shoulder needed to be removed, and she had not had her left breast looked at in a year because she had no insurance. (R. 266 - 67). The claimant stated that her most recent visit to a doctor occurred on March 25, 2004, after she was involved in a motor vehicle accident. (R. 268 - 70). The claimant testified that she could only sit for less than ten minutes and had pain that "shoots down" her lower back when she stands. (R. 271 - 72). She further stated that she spends six to eight hours a day in a recliner or bed. (R. 271). The claimant also indicated that she could only walk half a block. (R. 273).

At the hearing before the ALJ, a vocational expert, James Hare, testified that the claimant's past relevant work included a fast food worker, teller, and machine operator. (R. 277 - 78). The ALJ asked the vocational expert a hypothetical question to assess the claimant's ability to work. The vocational expert testified that an individual of the claimant's age, education, and work experience, who cannot lift more than ten or fifteen pounds and who needs a job with no contact with the general public and minimal contact with co-workers, could not perform the claimant's prior work, with the possible exception of a machine operator at a plastics plant. (R. 279 - 80). The vocational expert, however, also testified that an individual with the above

11

limitations would be able to perform several types of light and sedentary work with minimal

contact with people. (R. 280). The vocational expert testified that such a person could work as a

nut sorter with 650 jobs available in Alabama and 40,000 available nationally. (R. 280).

Additionally, the vocational expert testified that such an individual could work as a small

products assembler with 1,200 jobs available in Alabama and 150,000 available nationally. (R.

280).

In the ALJ's decision dated June 16, 2006, the ALJ found that the claimant did not

engage in substantial gainful activity after the alleged onset of disability. (R. 17). The ALJ further

found that the claimant suffers from the following severe medically determinable impairments:

status-post partial mastectomy for adenocarcinoma of the left breast; depression; and a history of

cocaine abuse, currently in relapse. (R. 21). The ALJ noted that he applied the "special

technique" in finding that the claimant suffers from a severe mental impairment. (R. 21). In

applying the "special technique," the ALJ rated the claimant's degree of limitation in functional

areas as mild to moderate in activities of daily living; moderate in social functioning; mild to

occasionally moderate in concentration, persistence, or pace; and no episodes of decomposition.

(R. 21).

The ALJ further noted that from 2001 to March 2004, no treating physician reported any

evidence of depression or anxiety. (R. 21). The ALJ stated that the medical evidence of record

established the absence of depressive signs and symptoms during the period of cancer treatment

in 2003 when the claimant was free from cocaine use. (R. 21). The ALJ further stated that

beginning in May 2004, the treating mental health doctors consistently reported that the

claimant's symptoms were only mild to moderate in severity with periods of improvement

12

coinciding with her compliance with prescribed medication. (R. 21).

The ALJ found that the claimant's alleged low back pain and right shoulder pain were not severe impairments. (R. 21). Specifically, the ALJ found no evidence that either of the alleged impairments significantly limited her physical or mental ability to do basic work activities. (R. 21). The ALJ further found no evidence of right shoulder pain of any kind. (R. 21). The ALJ stated that the record of the initial treatment for the low back and left knee pain on March 25, 2004, specifically noted that the lumbar strain and left knee contusion were non-acute and without any underlying fracture, bony abnormality, or disease process. (R. 21). Further, the ALJ stated that the claimant never sought treatment for low back pain after the initial treatment on March 25, 2004. (R. 22).

After determining that the claimant suffers from a severe medically determinable impairment, the ALJ noted that the claimant did not meet or equal a listing in the Listing of Impairments. (R. 22). The ALJ then assessed the claimant's residual functional capacity ("RFC"). The ALJ found that during the period from January 2, 2003, through January 7, 2004, the claimant's RFC consisted of an inability to maintain adequate work attendance due to the requirements of her medical treatment. (R. 22). The ALJ found that during the period since January 8, 2004, the claimant's RFC consisted of an ability to perform a full range of sedentary work that requires no contact with the general public and limited contact with co-workers. (R. 23). The ALJ based this finding upon the claimant's testimony that she was unable to work, because she could not lift anything heavier than ten to fifteen pounds; because she prefered isolation and was "afraid half the time;" and because she had suffered anxiety attacks two to three times per week since mid-2000. (R. 23). However, the ALJ did not give credit to the

13

claimant's testimony that she was "afraid half the time" and that she had suffered anxiety attacks

two to three times per week since mid-2000, because prior to January 8, 2004, no medical

evidence in the record existed to suggest the claimant was suffering from any anxiety. (R. 23).

The ALJ noted that although evidence existed of mild to moderate mental impairments since

January 8, 2004, no evidence corroborated her testimony about the frequency and severity of

anxiety attacks. (R. 23). Further, the ALJ stated that any medical evidence of anxiety was

suspect, because the diagnosis of anxiety was based entirely on the claimant's self-serving

statements of symptoms. (R. 23).

In assessing the claimant's RFC, the ALJ also considered the claimant's testimony that

she was unable to work because of constant excruciating pain. (R. 23). The ALJ discredited this

testimony, specifically finding that "virtually nothing" in the medical evidence of record

corroborated her subjective complaints of pain. (R. 23). The ALJ pointed out that during

chemotherapy and radiation therapy, the claimant did not state that she had any disabling pain;

rather, the ALJ found that the record showed the presence of only transient back pain, mild

headaches, and no other adverse side effects. (R. 23). The ALJ further pointed out that despite

the claimant's testimony that she could only sit for less than ten minutes at a time, during the

ninety minute hearing, the claimant sat normally, showing no signs of discomfort. (R. 23).

Finally, the ALJ stated that the claimant's credibility was further undermined by her testimony

about drug use in 2005 and her entry into drug therapy. (R. 23). The claimant originally testified

that she entered treatment after using drugs only once; however, in response to questions posed

by her representative, she testified that she used crack cocaine one to two times per week to

"medicate mentally and for pain." (R. 23 - 24).

The ALJ also considered the medical evidence of record in determining the claimant's RFC. Specifically, the ALJ stated that the clinical findings and opinions of Dr. Lasker, the claimant's treating chemotherapy specialist, and Dr. Pinkston, the claimant's supervising and attending radiation oncology specialist, supported the ALJ's conclusions as to the claimant's RFC. (R. 24). While neither physician offered an opinion regarding the claimant's RFC, the ALJ stated that the physician's clinical charting clearly showed the claimant's "remarkably good response to a satisfactory post-surgery course of breast cancer treatment with only mild symptoms of transient low back pain during chemotherapy and mild headaches and fatigue during radiation therapy." (R. 24). The ALJ stated that neither doctor reported significant functional limitations following the completion of therapy in January 2004. (R. 24).

Further, the ALJ stated that the findings of the claimant's treating psychiatrists, Dr. Glaser and Dr. Stone, corroborated the ALJ's finding as to the claimant's RFC. (R. 24). Specifically, the ALJ noted that both doctors reported that the claimant's depression was only moderate and that her symptoms improved when she complied with medication therapy. (R. 24). The ALJ also noted that both doctors charted the claimant's judgment, thought content and process, attentiveness, and memory as being good or without significant deficit. (R. 24). Additionally, the ALJ noted that both doctors charted a rising GAF through the second half of 2004. (R. 24). The ALJ stated that the medical evidence of record indicated to him that the lower assigned GAF of forty-two to fifty was in significant part due to a history of polysubstance abuse, because neither doctor charted any findings consistent with any serious impairment in functioning or any depressive symptoms above the moderate level. (R. 24).

Conversely, the ALJ did not credit the mental RFC proposed by Dr. Gerald Anderson, an

examining but non-treating psychologist. (R. 25). The ALJ offered four reasons for rejecting his

opinion. (R. 25). First, because the examination took place the day before the ALJ hearing at the

request of the claimant's representative and in preparation for the hearing, the ALJ "strongly

suspected" that the claimant was not completely honest with Dr. Anderson. (R. 25). Second, the

ALJ noted that the claimant described her symptoms to Dr. Anderson much differently than she

had reported them to primary treating psychiatrists Dr. Glaser and Dr. Stone. (R. 25). The ALJ

stated that the claimant had a motive to embellish her symptoms when she was examined by Dr.

Anderson. (R. 25). The ALJ determined, therefore, that Dr. Anderson was unable to provide a

valid opinion of the claimant's impairments or functional limitations. (R. 25). Third, Dr.

Anderson assessed the claimant during her crack cocaine relapse. (R. 25). Fourth, the ALJ stated

that on the RFC questionnaire, Dr. Anderson assessed the claimant with several marked and

extreme limitations of function, which the ALJ found inconsistent with Dr. Anderson's own

charted findings. (R. 25). The ALJ offers two examples: (1) Dr. Anderson reported that the

claimant had only a *moderate* range of depression; a *low-average* attention, concentration, and

mental condition; and an *adequate* recall of recent and remote events; however, Dr. Anderson

reported that the claimant suffered from a *marked* limitation in her ability to understand,

remember, and carry out simple instructions; (2) Dr. Anderson reported that the claimant's

judgment was "periodically impaired" in cooperating with others, but then concluded that she

suffers from an *extreme* limitation of function in her ability to relate appropriately to supervision,

co-workers, and work pressure in a work setting. (R. 25).

     Therefore, the ALJ concluded that during the period from January 2, 2003, through

January 7, 2004, the claimant's RFC consisted of an inability to maintain adequate work

attendance due to the requirements of her medical treatment. (R. 22). Additionally, the ALJ found that during the period beginning January 8, 2004, the claimant's RFC consisted of an ability to perform a full range of sedentary work that requires no contact with the general public and limited contact with co-workers. (R. 23).

After determining the claimant's RFC, the ALJ found that the claimant could no longer perform her past relevant work. (R. 25 - 26). The ALJ credited the vocational expert's testimony that the plaintiff could perform other work, such as a nut sorter and small products assembler. (R. 26). The ALJ then considered the claimant's age, education, work experience, and RFC, finding that jobs that the claimant could perform existed in significant number in the national economy since January 8, 2004. (R. 26 - 27). However, the ALJ found that the claimant could not perform any work between January 2, 2003, and January 7, 2004, because her medical treatments were so frequent that she would not have been able to maintain acceptable attendance. (R. 26). Therefore, the ALJ found that from January 2, 2003, through January 7, 2004, the claimant suffered from a "disability" as defined by the Social Security Act; however, the ALJ found that since January 8, 2004, the claimant did not suffer a "disability." (R. 28). Further, the ALJ noted that because no evidence existed of drug or alcohol use during the period the claimant was "disabled," the ALJ was not required to determine whether the claimant suffered from a drug addiction that was a contributing factor material to the determination of disability. (R. 27).

## VI. Discussion

### A. The ALJ's error in stating that the claimant had amended her alleged period of disability is immaterial.

The claimant argues that the ALJ erroneously stated that the claimant amended her

alleged period of disability at the hearing to specifically request a closed period of benefits from January 2, 2003, through January 7, 2004, and a period of continuing benefits from on or about May 10, 2004. The record in this case supports the claimant's argument that the ALJ erred in determining that the claimant had amended her alleged period of disability. In the beginning of the hearing before the ALJ, the ALJ specifically asked the claimant's representative if the alleged onset date continued to be January 5, 2003, and the claimant's representative answered in the affirmative. Further, at the end of the hearing, the ALJ asked the claimant whether she would like to amend her complaint to include a closed period of benefits, and the claimant's representative clearly replied, "No, no, Your Honor." (R. 284).

Although the ALJ erred by stating that the claimant had amended her alleged period of disability, this error is harmless. "Where an ALJ makes a factual error, the error will be considered harmless if it is clear that the error did not affect the ALJ's ultimate determination." *Kemp v. Astrue*, 308 F. App'x 423, 425 (11th Cir. 1009); *see also Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983). The ALJ's factual error did not affect the ALJ's ultimate determination. Throughout his opinion, the ALJ considered the claimant's allegations of disability over the entire time period beginning on January 2, 2003, not only the closed period ending January 7, 2004 and the continuing period beginning May 10, 2004. For example, in determining the claimant's RFC, the ALJ separately looked at the period of time from January 2, 2003 through January 7, 2004 and a continuing period beginning January 8, 2004. Further, the ALJ specifically found that the claimant was not disabled since January 8, 2004.

Additionally, although the claimant argues that she was disabled because of depression and anxiety, the record contains no evidence of the claimant seeking treatment for depression or

18

anxiety prior to May 10, 2004. The ALJ determined that the claimant's disability due to breast cancer ended on January 7, 2004 and that the claimant could not have been disabled due to depression and anxiety until May 10, 2004. The court finds that substantial evidence supports the ALJ's determination, because no evidence in the record indicates that the claimant even complained of depression or anxiety prior to her first visit with Dr. Glaser on May 10, 2004. Therefore, the court concludes that, although the ALJ made a factual error by stating that the claimant amended her alleged period of disability, this error is harmless because it did not affect the ALJ's ultimate determination.

### B. The ALJ properly considered the opinions of the treating physicians.

The claimant argues that the ALJ improperly disregarded the opinions of two treating physicians and one consulting examining physician in determining that the claimant was not disabled after January 7, 2004, because of mental impairments. First, the court notes that the ALJ began his discussion of the claimant's alleged mental impairments by finding that no evidence of anxiety or depression existed in the evidence of record until May 10, 2004, when the claimant first visited Dr. Glaser. As discussed above, substantial evidence supports the ALJ's decision that the claimant was not disabled because of a mental impairment prior to this date.

An administrative law judge must accord "substantial" or "considerable" weight to the opinion of a claimant's treating physician unless "good cause" is shown to the contrary. *Broughton v. Heckler*, 776 F.2d 960, 961 (11th Cir. 1985). The ALJ's failure to give considerable weight to the treating physician's opinion is reversible error. *Id.* at 961-62. The Eleventh Circuit has found "good cause" exists when the doctor's opinion was not bolstered by the evidence or the evidence supported a contrary finding. *See Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir.

19

1987); *Sharfarz v. Bowen*, 825 F.2d 278, 280-81 (11th Cir. 1987). The Eleventh Circuit has also found "good cause" exists when the treating physician's opinions were wholly conclusory or inconsistent with their own medical records. *See Jones v. Dep't of Health & Human Servs.*, 941 F.2d 1529, 1532-33 (11th Cir. 1991); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); *Crawford v. Commissioner*, 363 F.3d 1155, 1160 (11th Cir. 2004). "The ALJ must clearly articulate the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).

The claimant argues that the ALJ improperly disregarded the Global Assessment Functioning ("GAF") scores found by the claimant's two treating psychiatrists, Dr. Glaser and Dr. Stone. Dr. Glaser charted the claimant as having a GAF of forty-two in May 2004, with the highest score in the past year being forty-five. Dr. Stone charted the claimant as having a GAF score of fifty in October 2004, with the highest in the past year estimated as fifty.

Under the American Psychiatric Association's Global Assessment of Functioning scale, a GAF finding between forty-one and fifty represents serious symptoms or a serious impairment in social, occupational, or school functioning. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*, (4th ed. 1994). Nevertheless, "the Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI programs' and has indicated that GAF scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" *Wind v. Barnhart*, 133 F. App'x 684, 692 n. 5 (11th Cir. 2005) (quoting 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)).

The ALJ gave little weight to these scores in finding that the claimant was not disabled.

The claimant argues that the ALJ substituted his own judgment for that of trained psychiatrists in making this finding. The court disagrees. The ALJ reasoned that neither Dr. Stone nor Dr. Glaser charted clinical findings consistent with any serious symptoms or impairment in social, occupational, or cognitive functioning nor did they suggest that the claimant alleged such impairments. Both doctors found the claimant to have only moderate symptoms. Additionally, both physicians noted that the claimant had adequate judgment, thought content, thought process, attentiveness, and memory. The ALJ specifically determined that the low GAF scores, which otherwise might indicate that the claimant had serious impairments, were inconsistent with the doctor's own clinical findings that the claimant had "moderate" depression. Therefore, the court finds that the ALJ clearly articulated "good cause" for rejecting the GAF findings in light of the treating physicians' inconsistent findings noted in their charts.

The plaintiff also argues that the ALJ erroneously disregarded the opinion of the consulting examining psychologist, Dr. Anderson, who met with the claimant on September 13, 2005, the day before the hearing in front of the ALJ. Dr. Anderson is an examining but non-treating physician. Therefore, the ALJ is not required to give Dr. Anderson's medical opinions as much deference as the opinions of the two treating physicians. Because the treating physician's opinions differed from Dr. Anderson, the ALJ properly gave more weight to the treating physicians.

Further, the ALJ found that Dr. Anderson's opinions were inconsistent with his clinical findings. For example,  Dr. Anderson reported that the claimant had only a *moderate* range of depression; a *low-average* attention, concentration, and mental condition; and an *adequate* recall of recent and remote events. However, Dr. Anderson reported that the claimant suffers from a

*marked* limitation in her ability to understand, remember, and carry out simple instructions. Similarly, Dr. Anderson reported that the claimant's judgment is "periodically impaired" in cooperating with others, but then concluded that she suffers from an *extreme* limitation of function in her ability to relate appropriately to supervision, co-workers, and work pressure in a work setting. Because Dr. Anderson's opinions are inconsistent with his clinical findings, the ALJ properly disregarded Dr. Anderson's findings regarding the claimant's mental RFC.

Additionally, the ALJ gave several other reasons for discrediting Dr. Anderson's opinions. The ALJ determined that, because Dr. Anderson performed the examination at the request of the claimant's counsel in preparation for the hearing the next day, the claimant had a motive to embellish her symptoms. The ALJ noted that the claimant did in fact describe her symptoms differently to Dr. Anderson, leading him to a different diagnosis than the treating physicians' reached. The ALJ further noted that Dr. Anderson's assessment of the claimant occurred during her cocaine relapse, presumably indicating that the assessment was not fully credible.

The court finds that the ALJ properly relied on the clinical findings of treating physicians Dr. Glaser and Dr. Stone. The court finds that the ALJ properly rejected the GAF results, which the Commissioner has not endorsed and which were inconsistent with the clinical findings, and the inconsistent findings of non-treating physician Dr. Anderson. Therefore, this court concludes that the ALJ properly considered the opinions of the three doctors, and substantial evidence supports the ALJ's finding that the claimant was not disabled after January 7, 2004.

### VII. Conclusion

For the reasons stated, the court AFFIRMS the Commissioner's decision. The court will

enter a separate Order consistent with this opinion.

Dated this 25th day of June, 2009.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE